# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|                    |     |                          |
|--------------------|-----|--------------------------|
| UNITED STATES      | )   |                          |
|                    | )   |                          |
|                    | )   | Case No. 04-CR-1090-5    |
| v.                 | )   |                          |
|                    | )   | Judge Joan B. Gottschall |
| MICHAEL EDWARDS    | )   |                          |
|                    | )   |                          |

## MEMORANDUM OPINION AND ORDER

Defendant Michael Edwards pleaded guilty to selling between 35–50 grams of crack cocaine, or cocaine base. This quantity represents an accumulated amount, based upon numerous small sales from 2003 to 2004. Each individual sale was for 1/16th of an ounce or less.[1] Under the Federal Sentencing Guidelines, this quantity is assigned a base offense level of 28. The Presentence Investigation Report ("PSR") credits Edwards with two points off for acceptance of responsibility, and one point off for notifying the government early enough to avoid trial preparation, giving Edwards an adjusted offense level of 25 and an advisory Guideline range of 63–78 months.

In determining an appropriate sentence, the court is required to consider every factor listed in 18 U.S.C. § 3553(a),[2] including the seriousness of the offense and what is a just punishment for

---

[1] Edwards pled to receiving between 1/8th and 1/16th of an ounce of crack cocaine every couple of weeks. Assuming he received 1/16th of an ounce every other week for a year, this would constitute about 45 grams total. The court will assume, for purposes of calculation under the Federal Sentencing Guidelines, that Edwards sold 45 grams.

[2] 18 U.S.C. § 3553(a) specifies the following factors to be considered:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

the offense. § 3553(a)(2)(A). This inquiry requires, *inter alia*, a consideration of Mr. Edwards'

individual circumstances. Before turning to those, however, the court will address the Sentencing

Guidelines' suggested sentence as a policy issue.

## I.     Crack-Powder Sentencing Disparity

After *United States v. Booker*, 543 U.S. 220 (2005), and as emphasized again in *Rita v.*

*United States*, 551 U.S. 338 (2007), district courts must first calculate the Sentencing Guidelines

range. While the court is to give respectful consideration to the Guidelines' recommendation, it may

not presume the Guideline sentence to be the correct one. As the Supreme Court observed in

*Kimbrough v. United States*, 128 S. Ct. 558, 674 (2007), the respect to be given to the Guidelines

recommendation is at its apex when the recommendation is based on the Commission's expertise

(primarily, the sentencing practices of judges) or its study of the issue. However, the Supreme Court

also observed in *Kimbrough*, and more recently in *Spears v. United States*, No. 08-5721, 2009 WL

---

(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Federal Sentencing Guidelines];

(5) any pertinent policy statements [issued by the Sentencing Commission]; --

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

129044 (U.S. Jan. 21, 2009), that district courts may reject the Guidelines recommendations when they are *not* based on the Commission's expertise or study. *Id.* at *2.

The Commission generally creates its recommendations based on empirical research of past practices, a policy itself that has been highly criticized. However, even this did not occur when the crack and powder discrepancies appeared. *See Gall v. United States*, 128 S. Ct. 586, 594 n.2 (2007) (noting that the Commission "departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentence that Congress established for such crimes."). No empirical support for this approach was given.

Since the crack-to-powder disparity first appeared in 1986, the Commission has been working to end, or at least to reduce, the large sentencing disparity (generally 100:1) between crack offenses and powder offenses, a good chronology of which appears in *United States v. Eura*, 440 F.3d 625, 635 (4th Cir. 2006). In 1995, the Commission recommended to Congress that the disparity be eliminated in its entirety, a proposal Congress rejected. In 1997, it recommended that the ratio be changed to 5:1; Congress took no action in response. In 2002, the Commission recommended a 20:1 ratio, and in that report to Congress it provided several compelling reasons for why the current disparity is unwarranted. *See* U.S. Sentencing Comm'n, Special Report to the Congress: Cocaine and Federal Sentencing Policy (2002) (hereinafter "2002 Report"), *available at* http://www.ussc.gov/r_congress/02crack/2002crackrpt.htm.[3] The most pertinent of these reasons, which fully appear in the report and in its executive summary, are highlighted here:

---

[3] A more recent 2007 report has been sent from the Commission to Congress. *See* U.S. Sentencing Comm'n, Special Report to the Congress: Federal Cocaine Sentencing Policy (2007), *available at* http://www.ussc.gov/r_congress/cocaine2007.pdf. The 2007 Report does not alter the analysis in the 2002 Report.

- The current penalties exaggerate the relative harmfulness of crack cocaine.
  - Cocaine in any form produces the same physiological and psychotropic effects.
  - The negative effects of prenatal crack cocaine exposure are identical and probably not as dangerous as many legal substances.[4]
  - The "epidemic" of crack use by youth that was predicted never materialized to the extent feared.

- The Guidelines penalties apply most often to lower level offenders, even though the Congressional purpose to focus on "major" and "serious" drug traffickers is clear.
  - Over one-quarter of federal crack cocaine offenses involve relatively small drug quantities (less than 25 grams)   The same is not true for powder cocaine, since such small amounts would not result in a significant sentence.
  - There exists a "penalty gap," whereby relatively less culpable crack offenders are sentenced to longer periods than more significant powder sellers.  This is especially troubling because powder cocaine can be relatively easily converted into crack cocaine, meaning that major traffickers generally deal in powder, and leave it to the smaller dealers to convert it to crack.  Under the Guidelines, the small dealer of crack will often be sentenced more harshly than the supplier of powder, who is far higher in the drug distribution hierarchy.[5]

---

[4] Indeed, a recent New York Times article notes that while the use of crack during pregnancy does have a consistent and negative effect on the fetus, experts are now saying that the bad effects are *less* than those of alcohol or tobacco.  Susan Okie, *The Epidemic That Wasn't*, N.Y. Times, Jan. 27, 2009, at D1.  Without minimizing this risk, it is worth noting that the need for large sentences to "correct" this problem is overstated given our tolerance of alcohol and tobacco.

[5] Judge Adelman cites two particularly troubling cases in *United States v. Smith*, 359 F. Supp. 2d 771 (E.D. Wis. 2005):

Finally, the disparity in sentences involving crack and powder brings irrationality and possibly harmful mischief into the criminal justice system. All crack begins as powder, and transforming one into the other involves a quick and uncomplicated operation. Thus, guideline sentences vary widely based on facts that have little to do with culpability. For example, in *United States v. Shepherd*, 857 F. Supp. 105 (D.D.C. 1994), *remanded by* 102 F.3d 558 (D.C. Cir. 1996), the defendant agreed to sell powder to an undercover officer.  However, the officer, pursuant to his office "policy," insisted that the defendant cook the powder into crack.  She did so in her microwave and thus raised her guideline range from 46–57 (with a 5 year mandatory minimum) to 108–135 months (with a 10 year mandatory minimum).  *Id.* at 106–08. In its 1995 submission to Congress, the Commission reported a case in which two crack dealers, dissatisfied that the 255 grams of powder they had purchased

- Current quantity-based penalties overstate the seriousness of most crack cocaine offenses and fail to provide adequate proportionality.
  - The current penalty structure was based on many beliefs about the association of crack cocaine offenses with certain harmful conduct—particularly violence—that have been shown to be inaccurate.

- Current penalties' severity mostly impacts minorities.
  - The overwhelming majority of offenders subject to the heightened crack cocaine penalties are black, about 85 percent in 2000. This has contributed to a widely held perception that the current penalty structure promotes unwarranted disparity based on race.

2002 Report iv–vii. The only factor that the Commission noted could in any way justify a higher sentence for crack than for powder is that powder cocaine, because it usually is snorted, poses a lesser risk of addiction than is typically true of crack. However, the Commission has noted that this added danger is not susceptible to precise quantification. *Id.*

The Guidelines' 100:1 crack to powder cocaine disparity is notorious. In 2007 reforms were finally made by the Commission, but these reforms are not enough. Though the disparities between crack and powder sentencing vary somewhat depending on the particular quantities involved, the situation of Mr. Edwards appears to be a median assessment: Mr. Edwards, who dealt between 35–50 grams of crack when aggregated together, is subject to a base offense level of 28; if Edwards had been dealing in powder, he would have had to traffic in between two to three and a half *kilograms* to receive the same base offense. This represents a 57:1 to 70:1 ratio[6]

---

converted to only 88 (rather than the usual 200) grams of crack, arranged to return the drugs to their supplier, who had agreed to replace the powder at no cost. However, before they returned the drugs, the crack dealers were arrested. At sentencing, their guideline range was 121–151 months, while the supplier's range was just 33–41 months.

*Id.* at 780–81.

[6] At the smallest quantity, it is a 57:1 ratio. (2kg / 35g = 57.) At the largest, it is a 70:1 ratio. (3.5kg / 50g = 70.)

The Supreme Court's recent decision in *Spears*, No. 08-5721, 2009 WL 129044, made clear that it is appropriate for a district court to sentence crack defendants at a level closer to that applicable to powder defendants, based solely on the Guidelines' unjustified crack-powder disparity. *Id.* at *2. The current Presidential administration has indicated that it wishes to eliminate the crack-powder disparity. Civil rights, http://www.whitehouse.gov/agenda/civil_rights (last accessed Jan. 26, 2009). However, the court is also aware that in 1995, Congress rejected treating crack and powder as equivalents.

Based on the need to provide a just and fair sentence that is proportionate under § 3553(a), and considering the ample evidence that the crack-to-powder ratio is unjustifiable and unjust, is racially discriminatory in impact and is not proportionate, this court does not deem the 100:1 ratio, or the 57:1 ratio in Mr. Edwards' case, to be justified. Given the evidence that the harms produced by powder and crack are essentially the same (with the unquantifiable possibility that crack may be more addictive) this court concludes that a 10:1 ratio is all that can possibly be justified. It is possible, consistent with the new administration's position, that *no* disparity is justified. But this court is not a legislature and will assume, for the present time, that there is some difference in addictiveness that justifies some disparity in penalty. There is enough evidence, however, for it to be clear that the Guidelines' former 100:1 disparity, and its current, approximately 57:1 disparity, cannot be justified.

In the case of Mr. Edwards, applying a 10:1 ration, his base offense level is now 24 (45 grams of crack, sentenced at the level of 450 grams of powder). Including the adjustments, Mr. Edwards has an adjusted offense level of 21, and with a category II criminal history, his advisory Guidelines range is 46–51 months.

## II.      Specific Factors Related To Mr. Edwards

Mr. Edwards was indicted as part of a large conspiracy case involving approximately ten defendants, charged with distributing more than 500 grams of powder cocaine and more than 50 grams of crack.  Mr. Edwards is charged in the conspiracy count and also in a substantive count, alleging that on July 14, 2004, he possessed with intent to distribute crack, as well as with various telephone counts.  It is this one substantive count to which Mr. Edwards pleaded guilty.  He admits to receiving from his cousin, Cross, and possessing with the intent to distribute, 1.75 grams of crack (1/16 of an ounce) on July 14.  He also admits to receiving distribution amounts of crack  from Cross on multiple occasions during 2003 and 2004, once every several weeks for approximately one year.  Mr. Edwards admits to having distributed more than 35 grams of cocaine *in toto*.  Thus, it is clear that Mr. Edwards was a small retail dealer of crack during the approximately one year in question.  The government's evidence indicates that he was sophisticated enough in his crack dealings to avoid law enforcement himself during this year and, on at least one occasion, assist others in avoiding the police.  He referred others to his source of supply, Cross.  There is no evidence that Mr. Edwards was higher in the drug hierarchy than a small retail dealer, getting the drugs he distributed from his cousin.

Mr. Edwards' criminal history includes a controlled substance arrest in 2004 (which probably overlaps with the admitted conduct in this case) and a number of automobile and license-related charges.  He has a criminal history category II based on the controlled substance arrest and an unlawful use of a debit charge conviction in August, 2005.  The only time he has spent in custody was 30 days in 2005, for the credit card offense.  He successfully completed his probation in that case.

Mr. Edwards has five children born of a former relationship with Tiffany Campbell. He maintains that Ms. Campbell attempted to prevent him from developing a close relationship with his children, and that she has poor parenting skills. There is evidence to support Mr. Edwards' contention that he is by far the better and more consistent parent to his five children.

In January 2008, Mr. Edwards married Katrina Edwards, who is 29 years old and a nurse. Mrs. Edwards has an eight year old daughter who lives with the couple. In March 2008, the couple had their first child together. In June 2008, Tiffany Campbell, the mother of Mr. Edwards' five prior children, deposited the three oldest children with the local police and left the state. The police called Mr. Edwards, who picked up the children; these children are now living with Mr. and Mrs. Edwards, and Mr. and Mrs. Edwards have recently gained full custody. The Edwards are attempting to gain custody of Mr. Edwards' other two children, and currently have an arrangement where those children spend half the year with the Edwards, and half the year with Ms. Campbell.

Mr. Edwards has had academic problems since he started school and was dismissed from school in his freshman year of high school, after repeating at least one grade. He began receiving Social Security disability benefits at age 8 for a learning disorder. It appears that he was receiving social security benefits at the time of the conduct that forms the basis for this case. Until recently, he was supporting his family with those benefits and with Mrs. Edwards' income.

There is substantial indication that his marriage to Mrs. Edwards has been an extremely important positive step for Mr. Edwards. Mrs. Edwards and the defendant's mother both told the Probation Officer that he is a good father, to the best of his limited ability, providing the children, especially the adopted children, with their only source of stability. With Katrina Edwards, her child, the couple's child together and Mr. Edwards' three oldest children, the Edwards have created an apparently well-functioning family.

With a recent wedding to a woman who appears to have a law-abiding lifestyle, a new infant, Mrs. Edwards' prior child, and Mr. Edwards' three oldest children from his previous relationship with Ms. Campbell, it is clear that defendant's family responsibilities are unusual; his presence in the home, particularly for the three children of Ms. Campbell who live with him full-time, is significant. It appears that Mr. Edwards is attempting to get his life on a better track, and may be able to do so, with Mrs. Edwards' help. It should be noted that defendant's criminal convictions all precede by a number of years his relationship with Mrs. Edwards.

Prior to this case, Mr. Edwards had essentially no employment history. The Probation Officer reports that the *only* job he ever held was employment as a maintenance worker in Monee, Illinois, for some period between two and six months in 2005. Mr. Edwards was fired from this position after getting into an argument with a coworker. However, after the commencement of this case, Mr. Edwards sought job counseling on his own, and since August 2008, he has been employed as a maintenance worker for a bakery, working a little over half-time, and he has told his employer about this criminal case. Mr. Edwards has now been placed into a *second* job as well, where he intends to work when he is not working at the bakery. That Mr. Edwards, with a mental disability and no employment history, has managed to maintain a job for six months is highly significant. Mr. Edwards has also become active in his church, True Foundation Church, where he is currently a deacon, performing repair, maintenance and cleaning. His pastor states, "He is faithful to the ministry and a joy to have on board."

It is also clear that Mr. Edwards has significant mental limitations. The exact extent of his limitations is unknown. However, Mr. Edwards has received social security disability benefits for most of his life.

This is the extremely unusual case where it appears that for a number of reasons—including the involvement of an interested attorney, the dedication of the probation officer, and the presence in defendant's life of a wife with a career and a law-abiding lifestyle—a person with mental limitations, who had previously done nothing much but sell small amounts of crack on the street, has become gainfully employed, active in his church, a husband to a wife who has made a huge difference in his life, and a father not only to the children of his marriage but to three abandoned children from a prior relationship and the half-custodian of two additional children from that prior relationship.

Mr. Edwards' mental limitations somewhat lessen his culpability for this offense. His family responsibilities are truly unusual; were Mr. Edwards to be removed from this family for an extended period of time, a new wife would be left with between five and seven children (only two of them hers) and the three recently abandoned children would lose the only source of stability in their life. In addition to these factors, which standing alone make the case truly unusual, the court believes this is the unusual instance of extraordinary post-arrest rehabilitation. Mr. Edwards has married, taken responsibility for his children, become employed and become active in his church. Most important, he has had no arrests since his marriage to Mrs. Edwards.

Considering the § 3553 factors and the Guidelines, the court finds two reasons that justify departure from the Guidelines or a variance. One is Mr. Edwards' recently expanded familial responsibilities, and the traumatic effect separation from him is likely to have on his three, recently-abandoned children; in addition the court considers the burden it would place on Mrs. Edwards to have to care for three to five additional children, who are not hers, on her own. The other is his mental limitation, which contributed to this offense most likely by giving him too much time on his hands, when he should have been doing something of a law-abiding nature.

The sentence imposed in this case must recognize that Edwards committed a serious offense. It must also deter him and others from conduct similar to that in which he engaged. It must be sufficient to deter him and protect the public from further crimes of Mr. Edwards, were he to decide that he wanted to make money illegally again. But Mr. Edwards' mental limitations are a mitigating factor, as are his new, enormous familial responsibilities, and the needs of the three children whom Ms. Campbell abandoned for a consistent parent figure. Another mitigating factor is the evidence that Mr. Edwards has made significant changes in his life that will lead him to law-abiding, rather than criminal, conduct in the future.

Mr. Edwards is on the right path—a path that did not seem to even be a possibility at the time of this offense. Considering all these things, the court has determined that the public interest, and the factors articulated in § 3553, will be better served by supporting Mr. Edwards in the changes he has made, rather than by separating him from his wife, children and job. Mr. Edwards is accordingly sentenced to time served, and to five years' supervised release. Mr. Edwards is also sentenced to six months' home confinement, and continued electronic monitoring.

Should Mr. Edwards stray from the law-abiding path he has recently chosen, the five years of supervised release will give this court the opportunity to impose a lengthy custodial sentence. If he has truly changed his life, as it appears he may have done, this sentence will allow him to keep his job, keep his marriage intact, keep supporting and caring for his children and keep involved with his church.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: February 17, 2009

11